IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Emily McCulley,

          Plaintiff,

          vs.                          Case No. 12-2587-JTM

The University of Kansas School of
Medicine, and Steven Stites, M.D.,

          Defendants.

MEMORANDUM AND ORDER

Plaintiff Emily McCulley suffers from spinal muscular atrophy, which has rendered her unable to walk and left her with little upper body strength. McCulley applied for admission to the Kansas University School of Medicine, requesting as an accommodation the appointment of a staff person to serve as her assistant or surrogate during clinical rotations. After the School declined to offer this accommodation, McCulley brought the present action against the School and its Dean, Dr. Steven Stites, M.D., alleging they violated her rights under the Americans with Disability Act (ADA) and the Rehabilitation Act.

The defendants have moved for summary judgment, arguing that McCulley is not "otherwise qualified" to participate in the its program, because she cannot meet its Motor Technical Standards required for applicants. These Standards were previously adopted as essential to the School's accreditation. The court agrees, and grants defendants' motion.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as

a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).[1]

---

[1] The plaintiff has also filed a Motion to Strike the defendant's Reply (Dkt. 56). However, the court has reviewed the Reply, and finds it contains no novel argument or evidence. Rather, it simply offers direct and legitimate rebuttal to the arguments and factual contentions advanced by the plaintiff in her Response. The court accordingly finds no basis for striking the Reply. *See Peterson v. Garmin Intern.*, 833 F.Supp.2d 1299, 1307 (D. Kan. 2011). The court does exclude from its factual findings those contentions which are irrelevant, grounded on hearsay, or premised on evidence not properly before the court.

*Findings of Fact*

Emily McCulley was born in June 1988. In 1991, at the age of three, McCulley was diagnosed with spinal muscular atrophy, Type III. This is an inherited condition which affects the motor neurons that send signals to innervate the muscles. Because the muscles are not properly innervated, the muscles atrophy resulting in muscle wasting and weakness in the arms and legs.

Between 1991 and 1998, Emily McCulley was able to walk, stand, and jump; although she had a tendency to fall down and took a little bit longer to get up, she functioned pretty well even though she became fatigued more easily than her classmates.

Following an accident in 1998 that resulted in a leg break, Emily McCulley used a walker on and off for a couple of years, and also began using a wheelchair. In 2002, Emily McCulley began using a wheelchair exclusively because she no longer able to stand or walk.

McCulley uses a motorized wheelchair for mobility. In 2011, she acquired a standing wheelchair, which she can use in either a sitting or standing position and can be raised or lowered.

When in a standing position in her standing wheelchair, McCulley can raise herself to a position that would be eye level with someone who is approximately six feet tall. McCulley uses an accessible van with ramp and hand controls for driving. McCulley has reduced strength and can only lift between 10 to 20 pounds.

When she was eighteen, McCulley applied for and was granted monthly Social Security disability benefits. She also receives vocational rehabilitation benefits because of her disability.

McCulley entered the University of Kansas, Lawrence campus, as a freshman in Fall 2006. While an undergraduate, McCulley requested, and was granted, disability accommodations, including a handicap accessible room in student housing, parking

accommodations, and accessible seating accommodations in the laboratories and classrooms where she worked or studied.

McCulley graduated from KU in May 2010 with a Bachelor of General Studies degree in psychology and a Bachelor of Science degree in biology with an emphasis in neurobiology, which studies the brain and nervous system in humans and other animals.

In her first year at KU, McCulley decided she wanted to go to medical school. She applied to the Oklahoma State College of Osteopathic Medicine and the Kirksville College of Osteopathic Medicine and failed to receive an interview for either program. She also applied to the Kansas City University of Medicine and Biosciences (KCUMB), an osteopathic College of Medicine, in 2009, for admission to its class of 2010, and in 2010, for admission to its class of 2011. She did not receive an interview with KCUMB following the submission of her class of 2010 application for admission to its College of Medicine, because KCUMB concluded that her application was marginal in terms of meeting its admission requirements (e.g., MCAT score, science GPA, overall GPA).

Following submission of her class of 2011 application for admission to the KCUMB college of medicine, McCulley received an interview which was designed to evaluate her capacity to meet KCUMB's technical standards for its College of Medicine program. Those standards provide:

Motor

Candidates and students should have sufficient motor function to execute movements reasonably required to provide general care and emergency treatment to patients. Examples of emergency treatment reasonably required of physicians are cardiopulmonary resuscitation, administration of intravenous medication, the application of pressure to stop bleeding, the opening of obstructed airways, the suturing of simple wounds and the performance of simple obstetrical maneuvers. Such actions require coordination of both gross and fine muscular movements, equilibrium and functional use of the senses of touch and vision.

Strength and Mobility

Osteopathic treatment often requires upright posture with sufficient lower extremity and body strength; therefore, individuals with significant

limitations in these areas would be unlikely to succeed. Mobility to attend to emergency codes and to perform such maneuvers as CPR also are required.

At the meeting, McCulley was shown a number of osteopathic manipulation maneuvers and asked to demonstrate her motor and strength and mobility capacities to successfully perform the maneuvers. She was also asked to demonstrate her ability to do chest compressions on a Manikin, a life-size human dummy, while the Manikin was on the ground and while the Manikin was on an examination table; and in both instances, McCulley was unable to compress the Manikin's chest the degree necessary to successfully perform CPR chest compressions. McCulley was asked to perform the Heimlich maneuver on a half-torso Manikin and then on one of the faculty members, but she was unable to demonstrate that she could generate enough force to dislodge an airway obstruction.

The KCUMB admissions subcommittee concluded that McCulley could not meet the school's technical standards, and that she could not be accommodated without substantially altering its educational program. KCUMB denied McCulley admission to its College of Medicine class of 2011 because it determined that she could not meet the program's Minimum Technical Standards for Admission and Matriculation.

Following receipt of KCUMB's denial of admission to the College of Medicine class of 2011, McCulley filed a complaint with the United States Department of Health and Human Services Office of Civil Rights alleging that KCUMB had discriminated against her based on her disability. The U.S. Department of Health and Human Services Office of Civil Rights issued its decision finding no probable cause to McCulley's complaint of disability discrimination filed against KCUMB.

The University of Kansas is a state-supported institution of higher education. It also receives federal funding.

The University of Kansas' Kansas University Medical Center is located in Kansas City, Kansas, and educates healthcare professionals in three schools:  The School of Medicine (with campuses in Kansas City, Wichita and Salina), The School of Nursing, and

The School of Health Professions. The School of Medicine, established in 1905, is the only school of medicine in Kansas and its mission is to train physicians for Kansas.

Post-graduate professional medical education at the KU School of Medicine involves a selective, qualified admissions process that ensures those admitted possess a demonstrated record of educational success, objectively tested aptitude (Medical College Admissions Test), and the requisite skills and abilities to be successful in the post-graduate professional medical educational program. Post-graduate professional medical education is the gateway to professional licensure and practice as a physician.

The Kansas Board of Healing Arts requires graduation from "an accredited healing arts school or college" as a pre-requisite for qualification to sit for examination to practice as a physician. See K.S.A. 65-2873(2). To be an accredited school of medicine, the school or college must require "study of medicine and surgery in all of its branches . . . to have a standard of education substantially equivalent to the university of Kansas school of medicine." K.S.A. 65-2874.

The Board of Healing Arts also provides that it establishes the criteria for minimum standards for accreditation of medical schools and that those standards will include: 1) Admission requirements; 2) basic science course work; 3) clinical course work; 4) qualification of faculty; 5) ratio of faculty to students; 6) library; 7) clinical facilities; 8) laboratories; 9) equipment; 10) specimens; 11) financial qualifications; and 12) accreditation by independent agency. *See* K.S.A. 65-2874(b).

Professional medical education trains individuals to be physicians, which involves clinical, hands-on patient care by the medical student.

Dr. Stites was Interim Dean of the School of Medicine from April 10, 2012 through February 1, 2013. Stites has been a physician faculty member in the KUMC Department of Internal Medicine since July 1999, and is a pulmonary and critical care specialist.

The KU School of Medicine has established Technical Standards and Requirements

for admission and matriculation.

The KU School of Medicine curriculum is designed to prepare students to practice as physicians, and it is designed to meet the requirements for accreditation of its educational program by the Liaison Committee on Medical Education (LCME) and to prepare its students to pass the United States Medical Licensure Examination (USMLE) required for licensure as a physician in the United States.

The LCME, which is sponsored by the Association of American Medical Colleges (AAMC) and the American Medical Association, is the nationally recognized authority for medical education programs leading to the M.D. in the United States and Canada. The U.S. Department of Education recognizes the LCME for accreditation of programs of medical education leading to the M.D. degree in the United States. Most state boards of licensure require that U.S. medical schools be accredited by the LCME, as a condition for licensure of their graduates. Eligibility of U.S. students to take the USMLE requires LCME accreditation of their school. Graduates of LCME-accredited schools are eligible for residency programs accredited by the Accreditation Council for Graduate Medical Education (ACGME).

The USMLE is a three-step examination for medical licensure in the United States. It assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care.

The KU School of Medicine requires passage of Steps 1 and 2 of the USMLE before graduation. Step 2 of the USMLE includes two separate test components, the Clinical Knowledge test and the Clinical Skills test, which are each one-day exams.

The Step 2 Clinical Knowledge test is a computer-based examination of the clinical sciences and includes questions related to gynecology and obstetrics, internal medicine, pediatrics, preventive medicine and public health, psychiatry, and surgery. The Step 2

Clinical Skills test uses standardized patients to test medical students and graduates on their ability to gather information from patients, perform physical examinations, and communicate their findings to patients and colleagues.

To prepare its medical students for successful passage of the USMLE Step 2, as part of the KU School of Medicine curriculum, the Clinical Skills Assessment examination is administered to all rising 4th year medical students who have completed their 3rd year clinical rotations.

The Clinical Skills Assessment examination is an all-day examination in which each student must go through twelve patient encounters representing various medical disciplines. The student in those patient encounters must demonstrate their physical examination skills, history-taking and interpersonal communication skills, diagnostic reasoning, and patient management techniques.

The School of Medicine curriculum is broken into two phases. Phase I, which is years one and two of the program, is generally, but not exclusively, didactic and classroom-based, although medical students begin learning and practicing basic clinical skills by participating in standard patient encounters that are integrated into their problem-based learning curriculum. First-year medical students also must obtain American Heart Association Basic Life Support for Healthcare Professionals certification.

Phase II of the School of Medicine curriculum, years three and four of the program, is predominantly in the clinical setting with occasional classroom requirements, training sessions, and special workshops. In Phase II, medical students take required clerkships in the core clinical disciplines: Family Medicine, Geriatrics, Internal Medicine, Neurology, Obstetrics and Gynecology, Pediatrics, Psychiatry and Surgery.

Medical student clerkship experiences take place in the hospital and clinic settings with the medical students rotating on the teaching services, teaching rounds, departmental case conferences, and weekly Grand Rounds.

The KU School of Medicine uses a team-based approach to learning in the medical clerkships. In the course of the medical clerkship experiences, medical students learn by doing and are frequently by themselves with patients while working as part of the medical team in that clinical discipline. They interview, examine, and assess the patients independently, and then they engage with the faculty or the residents concerning their examination and assessment of the patient.

For LCME accreditation, a school must explicitly articulate its technical standards. The KU School of Medicine's Technical Standards articulate the abilities and expectations that must be met by all students admitted, and after students are admitted, they are asked to attest to their ability to meet these standards, with or without accommodations. The abilities and expectations articulated in the KU School of Medicine's Technical Standards are stated under the following headings: 1) Observation, 2) Communication, 3) Motor, 4) Intellectual, Conceptual, Integrative, and Quantitative Abilities, and 5) Behavioral and Social Attributes.

As reflected in its Technical Standards and its curriculum, the M.D. program at the KU School of Medicine requires all medical students to possess the following motor skills and abilities, which are essential to a medical students ability to successfully complete the requirements of the M.D. degree:

> **Motor:** Candidates should have sufficient motor function to elicit information from patients by palpation, auscultation, percussion, and other diagnostic maneuvers. A candidate should be physically able to do basic laboratory tests, carry out diagnostic procedures (suturing, paracentesis, etc.), and read electrocardiograms and radiographs. A candidate should be able to execute motor movements reasonably required to provide general care and emergency treatment to patients. Examples of emergency treatment reasonably required of physicians are cardiopulmonary resuscitation, the administration of intravenous medication, the application of pressure to stop bleeding, the opening of obstructed airways, the suturing of simple wounds, and the performance of simple obstetrical maneuvers. Such actions require coordination of both gross and fine muscular movements, equilibrium, and functional use of the senses of touch and vision.

It is factually uncontroverted that the Technical Standards contain a motor

component because gross and fine motor skills are essential to the learning process for medical students and are skills necessary to becoming a competent, successful clinical practitioner.

The skill and ability to do a competent, thorough head-to-toe physical examination is something that the School of Medicine trains its medical students to do. Physical examination is an essential element in the physician's ability to assess, diagnose, and treat a patient. Physical examination involves the actual laying on of hands by the medical student in order to palpate or use the hands to determine such facts as size, shape, firmness, and location. Physical examination requires both strength and mobility as the medical student must have the strength, flexibility, and mobility to not only move and position themselves as necessary to examine the patient who, due to their condition may be on the floor, in a chair, on an examination table, but also the strength and mobility to move and position a patient who is unable to move or position themselves.

The plaintiff attempts to controvert these facts by citing a portion of Dr. Stites' deposition, in which he acknowledged that other medical students can have problems lifting extreme large patients. But this observation does not challenge the general importance of physical examination, or have substantial relevance to the plaintiff, with her extremely limited strength.

The plaintiff also observes that hospital staff are trained in basic life savings techniques, and cites the testimony of her treating physician, Dr. Scott Meyers, who states that physicians "generally" do not directly performing basic life saving techniques like CPR. Rather, he believes that physicians typically give directions to staff, that such techniques are not needed until after medical school, that it shouldn't be "a difficult thing" to have staff available to position patients, and that he himself doesn't use "a lot of strength" when he conducts physical exams. Meyers further testified that he believes it would be "out of the ordinary" for the school to leave a student by themselves with a

patient. However, Dr. Meyers does not appear to have any separate expertise in medical education and no substantial experience in training medical students. More importantly, Dr. Meyers explicitly admitted that he would defer to the opinions of KU Medical School personnel as to curriculum and reasonable accommodation.

Given the circumstances, which by nature of the practice of medicine can be and frequently are unpredictable, the medical student must be able to move freely and expeditiously in performing physical examinations and medical procedures in areas which are frequently small and confined with the presence of the patient, equipment and other medical personnel.

The plaintiff attempts to controvert this fact by citing the experience of another medical student at KU, who underwent a leg and hip amputation in 2010, and was allowed as a reasonable accommodation the use of a prosthetic leg. However, this fails to controvert the evidence cited by the defendant, as the plaintiff has failed to show that this student was similarly situated to her. The evidence shows that, aside from the amputation, the other student "had no other strength impairment or stamina impairment," in contrast to the plaintiff, who suffers from a systemic illness, affecting "almost all of her major muscles," severely limiting her strength in both her upper and lower body. The other student later withdrew from the School of Medicine.

General care and emergency treatment, as required in the Technical Standards, necessarily require the ability to move freely and expeditiously. For instance, if a patient arrests, the medical student must be able to immediately begin cardiopulmonary resuscitation (CPR), which is why the KU School of Medicine requires each of its student to obtain American Heart Association certification in Basic Life Support for medical professionals. It is uncontroverted that chest compressions in CPR require substantial strength and stamina in order to sufficiently perfuse the blood through the body, and if the medical student is alone, they must be able to move back and forth between performing

11

chest compressions and providing air to the patient.

Intubation, or the placement of an airway in a patient, requires strength and mobility for the medical student to position themselves and the patient in the optimal position for insertion of the airway; performance of a well-woman gynecological examination requires the ability of the medical student to position themselves so that they can with both hands palpate the ovary simultaneously internally and externally; placement of a chest tube through the ribs to inflate the lung or placement of the needle for lumbar puncture require strength, dexterity, and stamina in order for the medical student to position themselves and the patient optimally; and performance of an orthopedic examination of limb requires mobility, strength, and stamina in order to move the limb through the range of motion to feel crepitus (e.g. grating, crackling, popping in the joint) and instability.

The training of medical students at the KU School of Medicine requires motor skills because the KU School of Medicine's M.D. degree is a broad, undifferentiated medical curriculum that trains medical students to practice as physicians in a broad variety of clinical areas.

McCulley first applied to the KU School of Medicine in August, 2010 for admission to the class of 2011, and learned in October, 2010 that she would not be offered a position. She applied again in June, 2011, and submitted a Supplemental Application on July 13, 2011.

McCulley was interviewed in September 2011. On September 30, 2011, Dr. Barbara F. Atkinson, M.D., Executive Vice Chancellor and Executive Dean, wrote McCulley that she was being offered a position in the 2012 entering class as an Early Decision Program candidate, and that she would be receiving a packet of materials from the admissions office regarding acceptance and matriculation. As part of the admissions process, all students are required to submit a statement concerning their ability to meet the Technical Standards and

Requirements.

In a letter dated January 20, 2012, McCulley was congratulated on her selection for admission into the 2012 entering class of the University of Kansas School of Medicine, but the admission was explicitly conditional. The defendant wrote that McCulley's "matriculation into the School of Medicine is contingent upon completion of a number of items that will be outlined in this and future mailings (both hardcopy and electronic)." The letter told McCulley that she must submit "one signed copy of the enclosed Technical Standards and Requirements" by March 1, 2012.

On February 1, 2012, McCulley signed her Technical Standards and Requirements form. That form acknowledged:

> Motor and Sensory: Candidates should have sufficient motor and sensory function to elicit information from patients by palpation, auscultation, percussion, and other diagnostic maneuvers. A candidate should be physically able to do basic laboratory tests, carry out diagnostic procedures (suturing, paracentesis, etc.), and read electrocardiograms and radiographs. A candidate should be able to execute motor movements reasonably required to provide general care and emergency treatment to patients. Such actions require coordination of both gross and fine muscular movements, equilibrium, and functional use of the senses of touch and vision.

In completing the form, McCulley marked the line indicating "I can meet the technical standards of the School of Medicine with accommodation. (Please attach an explanation and a request for the School of Medicine to review reasonable accommodation)," and, on the form she wrote "SEE BACK." She then wrote:

> I use a wheelchair because I can not [sic] walk or stand. So only physical accommodations (like an accessible desk/chair in the classroom) would be necessary. I have spoken w/ Carol Wagner and we are in the process of setting up a meeting to determine accommodations I might need.

On March 20, 2012, the plaintiff and her sister, Barbara McCulley, went to the School of Medicine in Kansas City, and met with Carol Wagner (EO Specialist/Disability Specialist), and Dr. Mark Meyer (Associate Dean Student Affairs). Because the plaintiff had indicated a preference for attending the School of Medicine's Wichita campus, Dr. Meyer also had Dr. Garold Minns (the Dean of that campus) attend remotely via ITV.

From her discussions with attorneys, McCulley understood that the meeting was a part of the ADA's requirement for interactive dialogue, and that the meeting began with a discussion of her physical capabilities, before moving to a discussion of the clinical rotations, and how she would handle such situations. McCulley has testified that she would need certain accommodation, including having "a nurse or a medical assistant could help me position patients or to shadow me if I'm doing rounds on patients in emergency situations."

On March 26, 2012, McCulley submitted her "Accommodation Request and Explanation for KU School of Medicine" after she was asked to do so at the March 20, 2012 meeting. McCulley wrote:

> Performing chest compressions (CPR) would be possible if a table with adjustable height is available. It is hard to determine how successful I will be with this procedure, but I have the flexibility to turn, reach, and lock my elbows onto a patient's chest. I also have enough muscles in my back to lift up the entirety of my body, but I anticipate that doing chest compressions for an extended amount of time would not be possible.

> Concerning the surgery rotation in the clinical years of medical school, I would be able to pull up close to the table and rise to the height the surgeon dictates. My chair takes up more room than a standing person, so the surgeons and other medical professionals involved would just need to be willing to work with me. I have taken dissection classes as part of a large group, in which other students, and I, have had no problems being able to squeeze together to reach structures and work together. I have normal endurance and stamina, so holding small objects for a long period of time is fine. I would only have a problem if I would have to hold something greater than ~ five pounds out and away from my body for a long period of time. If I could rest my elbow on the side of the surgery table, this would then be possible. Procedures like sutures or cutting would not pose a problem since it requires more fine dexterity than gross muscle strength.

> My sensation is normal, so palpating and lifting smaller parts of a patient is possible. I will not be able to physically lift a patient, but I can efficiently move less heavy body parts (like arms, head, and feet) necessary for physical examinations.

> For an ob/gyn rotation, I would be able to view and assess the different stages of dilation of a patient in labor. I would not be able to use an excessive amount of force (equaling greater than 25 pounds pushing or pulling) during a delivery procedure. Holding a newborn baby out and away from my body would be difficult for me, but I am able to hold and move a baby close to my body. Since I do not have experience with this type of situation, I am only

speculating what would be a problem for me.

Previously, I have been able to assist with gynecological and prenatal exams while shadowing physicians, so I am confident that I will be able to align my chair appropriately to examine a patient in that setting.

I have, and will continue, to work hard and be successful as a medical student and future physician. I do not plan on specializing in a physically demanding medical area (like obstetrics, trauma, surgery, etc.). I have received only respect and opportunity from KU, and hope that my disability will not be the one factor holding me back from living up to my fullest potential. Please feel free to contact me for any further clarification or anything else I can do. Thank you for taking the time to understand my abilities.

At some point after the March 20 meeting, Dr. Minns and Dr. Meyer decided they should get input from the directors of the clinical rotations for the Wichita campus. Sometime in late April to early May 2012, Karen Drake, an assistant to Wagner located on the Wichita campus, asked that the eight clinical directors for the Wichita campus submit the physical requirements for their respective clinical rotations, including: family medicine, geriatrics, internal medicine, obstetrics and gynecology, pediatrics and surgery, psychiatry and neurology. These directors met with Drake in early May, and Drake forwarded their observations to McCurdy. Dr. Minns and Dr. Meyer also met with the rotation directors. According to Dr. Minns, the directors "were very sympathetic to [McCulley's] request, but they reserved vital comment until they had thought about it a little bit more and considered all the activities in the clerkship and which ones might be a challenge." The School of Medicine then prepared forms based on the directors' observations.

On May 24, 2012 McCulley was provided "Clinical Rotation Information" forms with information concerning the clinical rotations in Family Medicine, Geriatrics, Internal Medicine, OB/GYN, Pediatrics, and Surgery, and was requested to have her physician complete the forms and return them to Sandra McCurdy, Associate Dean, Admissions.

On June 26, 2012, McCulley submitted to Sandra McCurdy, Associate Dean of Admissions, a letter dated June 22, 2012 from her physician, Dr. Scott Meyers. Dr. Meyers

wrote:

> This is in response to a request of my opinion as to whether McCulley would be able to complete the requirements of medical school were reasonable accommodations were made.

> From review of the clinical rotation information that I was provided, I do feel that she would be able to perform all but a few of the listed activities.

> I don't think that accommodations would be possible to enable her to perform some of the physical components of BLS due to the unexpected nature of the need for these techniques. Also, some of the rotational requirements suggest that the student will need to have the ability to "assist unstable elderly patients" or "position the patient". This would also be difficult for Emily. However, the same difficulty would be present to some degree for students of slight stature or strength when interacting with a patient of larger size and accommodations could be made. The only other activity listed that would be an issue for Emily is attending a home visit when some of the homes would not be ADA accessible. As this is listed as a requirement on the geriatric rotation, it would be likely that some of the patients would have ADA accessible homes.

> Therefore the solution in this case would be to identify those homes and allow her to make visits with those patients.

> I feel that Emily would be able to perform the remainder of the required activities with either no accommodations needed or with accommodations that would be simple to put in place.

Dr. Meyers was later asked in his deposition about his observation that the plaintiff needled only "simple" accommodations. He responded that he "did not come up with any accommodation" and that, other than what he mentioned in the letter, he did not have any specific accommodations in mind.

On June 28, 2012, Sandra McCurdy, e-mailed McCulley regarding Dr. Meyers' letter and stated:

> I am in receipt of your email and Dr. Meyers' letter. Unfortunately, the letter does not provide the information we requested, and need, in order to identify and evaluate the accommodations necessary for you to meet the outlined clinical course requirements. Dr. Meyers states there are curricular requirements he believes you could perform with accommodations that would be simple to put into place, but he identifies specifically neither the curricular requirements nor the accommodations that he believe to be "simple."

> As stated when the forms were sent on May 24, we do need a

16

physician to complete the third and fourth sections of the form for each of the clinical rotations. *Specifically, for each clinical course, we must know which course requirements you would be able to meet without needing any accommodations; which requirements you would be able to meet with accommodations, and what those accommodations would be; and which, if any, requirements you would not be able to meet. For those you will not be able to meet, it would be helpful to have an explanation of the specific limitation(s).*

For the School of Medicine to conduct a timely review of your accommodations needs, all requested information must be submitted to me no later than Thursday, July 5.

On July 3, 2013, McCulley e-mailed to Sandra McCurdy the completed Clinical Rotation information "forms, hand written, filled out, initialed, and signed from [her] doctor." These forms, initialed by Dr. Meyers, provided information concerning McCulley's capacity to perform the activities contemplated within the clinical rotations, and stated:

a. Family Medicine – "May not be able to independently position [patients] if positioning requires lifting/moving greater than [approximately] 20 lbs. because of decreased strength." "Have other medical professional (CNA, LMA, RN, student, etc.) assist with positioning [patients]."

b. Geriatrics – "Unable to catch elderly [patients] or assist [patients] requiring excessive strength (> 20 lbs)." "Choose an accessible home for home visit – does not necessarily need to be "ADA" accessible, just reasonably accessible for Emily. Have medical personnel assist in stabilizing unstable/weak [patients]."

c. Internal Medicine – "BLS [basic life support] on floor or bed, will not be able to use enough physical force for chest compressions."

d. OB/GYN – Unable to stand at bedside because of Emily's lack of leg strength. Allowance to raise her chair to necessary height in order to access [patient]/perform procedures."

e. Pediatrics – "Allowance to raise chair to necessary height."

f. Surgery – "Unable to move [patients]. Allow her to raise chair to height of surgery table. Have medical staff assist with moving [patients]."

The handwriting on the completed Clinical Rotation information forms, with the exception of Scott Meyers' initials, is not that of Dr. Meyers, and he believes it is McCulley's handwriting. Dr. Meyers has testified that he agrees with the comments. It is uncontroverted that Dr Meyers does not know what the KU School of Medicine's Technical

Standards are, and he did not review them prior to initialing the Clinical Rotation information forms

Dr. Meyers has admitted that the plaintiff would have difficulty in performing various medical procedures. Given the "limitations of her upper body strength," he cannot state that McCulley would be able to perform a general gynecological wellness exam. He also stated that McCulley would have difficulty delivering a baby. He has also testified that it would be difficult for her to perform an endotracheal intubation, or arterial puncture/line placement. She would also have difficulty with inserting a nasogastric tube, Foley catheter, or chest tube.

Dr. Mins met again with Dr. Meyer and the clinical rotations directors. According to Dr. Minns, none of the directors indicated that accommodation was "impossible," or that they expressed a "refusal" to accommodate McCulley, and reserved the determination of the reasonableness of any accommodation to the School of Medicine. However, all of the directors felt that McCulley would face "some real challenges that were going to be difficult to sort out." Many of the directors "felt like it was going to be difficult for [McCulley] to be much more than an observer in many cases and we usually don't let students graduate just on observation."

Dr. Minns testified that both the surgery and obstetrics faculties were concerned with emergencies which might arise during otherwise ordinary procedures, with the result that there were "grave doubts whether she could be accommodated in a manner that would preserve patient safety and also preserve the integrity of Ms. McCulley's education."

Based on the input from these directors, Dr. Stites wrote McCulley on July 16, 2012:

> Based on the information that has been developed in the course of discussions and informational exchanges with you, it has been determined that you cannot meet the essential requirements of the KUMC School of Medicine's educational program with or without reasonable accommodation…. Having determined that you cannot meet the technical requirements of the School of Medicine's educational program with or without reasonable accommodation, I regret to inform you that your admission is rescinded and you are denied admission to the School of

Medicine.

Dr. Stites has averred that the decision to deny McCulley admission was not about her being in a wheelchair or her having spinal muscular atrophy; it was a recognition of the reality that McCulley is physically too weak and limited to meet the School's motor Technical Standard.

The court finds that the evidence shows that plaintiff does not have the physical, motor capacity "to execute movements reasonably required to provide general care and emergency treatment." The evidence is uncontroverted that this lack of motor capacity to execute movements reasonably required to provide general care and emergency treatment would create a danger for McCulley and for patients. The use of a substitute or surrogate to perform for McCulley those physical, motor movements she could not perform herself would reduce her to the role of an observer rather than that of a medical student clinician. Such a substitution would also would necessitate a fundamental alteration of the School of Medicine's curriculum, especially in the clinical medical clerkships where McCulley, like all other medical students, would be expected to perform direct patient care as part of the clinical learning experience.

On September 5, 2012, McCulley filed her Complaint in the United States District Court for the District of Kansas against the School of Medicine and Dr. Stites, alleging discrimination under the ADA and the Rehabilitation Act.

*Conclusions of Law*

The Rehabilitation Act prohibits the exclusion any "otherwise qualified person with a disability" from participation in any program receiving federal assistance. 29 U.S.C. § 794(a). In the context of education, such an otherwise qualified person is defined as an individual who, despite a disability, "meets the academic and technical standards requisite to admission or participation in the [school's] education program or activity." 34 C.F.R. §

104.3(k)(3). The ADA similarly prevents discrimination against any disabled person who "is qualified, with or without reasonable accommodation, to perform the essential functions" of the position desired. *Zwygart v. Board of County Comn'rs of Jefferson County*, 483 F.3d 1086, 1090 (10th Cir. 2007). While schools must attempt to reasonably accommodate persons with disabilities, the Supreme Court has made clear that the school is not required to make fundamental or substantial modifications to its program or standards. *See Alexander v. Choate*, 469 U.S. 287, 300 (1985).

In the absence of direct evidence of discrimination, plaintiffs asserting claims under both the Rehabilitation Act and the ADA may rely on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Duvall v. Putnam City School Dist.*, __ Fed.Appx. ___, 2013 WL 3971050, *4 (10th Cir. Aug. 5, 2013) (Rehabilitation Act); *Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134, 1141 (10th Cir. 2011). "Neither Title III of the ADA nor the Rehabilitation Act require a graduate school to admit 'a disabled student who cannot, with reasonable accommodations, otherwise meet the academic standards of the program.'" *Doe v. Oklahoma City University*, 406 Fed.Appx. 248, 250 (10th Cir. 2010) (quoting *Mershon v. St. Louis University*, 442 F.3d 1069, 1076 (8th Cir. 2006)).

Thus, in the present action the plaintiff's initial burden includes the requirement of demonstrating the existence of a reasonable accommodation that would permit her to meet the School's essential eligibility requirements. *Zukle v. Regents of University of California*, 166 F.3d 1041, 1047 (9th Cir. 1999). Essential eligibility requirements are those which "bear more than a marginal relationship to the program at issue." *Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 462 (4th Cir. 2012) (citation and internal quotation omitted).

In *Southeastern Comm. Coll. v. Davis*, 442 U.S. 397, 406 (1979), the Supreme Court determined that the defendant nursing school was not required to modify its academic standards to accommodate a prospective student suffering from a hearing disability which rendered her unable to understand speech except through lipreading. The Court concluded

that the plaintiff had failed to present a claim under the Rehabilitation Act in light of evidence showing that "the ability to understand speech without reliance on lipreading is necessary for patient safety during the clinical phase of the [nursing] program [and] indispensable for many of the functions that a registered nurse performs." 442 U.S. at 407.

The Court noted that the accommodations requested by the plaintiff would inherently alter the education provided by the nursing school:

> The uncontroverted testimony of several members of Southeastern's staff and faculty established that the purpose of its program was to train persons who could serve the nursing profession in all customary ways. This type of purpose, far from reflecting any animus against handicapped individuals is shared by many if not most of the institutions that train persons to render professional service. It is undisputed that respondent could not participate in Southeastern's nursing program unless the standards were substantially lowered. Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person.

*Id.* at 413 (record citations omitted).

Because the plaintiff here has failed to carry the burden of demonstrating the existence of a reasonable accommodation, summary judgment is appropriate. The evidence shows that the School of Medicine's Motor Technical Standards were adopted as part of its accreditation procedures, and that those Standards serve to ensure that medical students can execute physical movements which are reasonably required to provide general care and emergency treatment. The Motor Technical Standards are an essential requirement for participation in a medical education at the KU School of Medicine.

Further, the uncontroverted evidence shows that the School's decision to deny admission was not premised on McCulley's use of a wheelchair or her spinal muscular atrophy, but a recognition of the reality that McCulley is physically too weak and limited to meet the Motor Technical Standard.

The plaintiff's lack of physical motor capacity to execute movements reasonably required to provide general care and emergency treatment would create a danger for the plaintiff and for patients. The requested accommodation, the appointment of a staff aide

or surrogate to perform the physical, motor movements which the plaintiff could not perform for herself, would reduce the plaintiff to the role of an observer rather than that of a medical student clinician. Substitution of a surrogate would force a fundamental change in the School's curriculum, especially in the clinical medical clerkships where students are expected to perform direct patient care as part of the learning experience.

Here, the plaintiff's request for a staff aide or surrogate is based simply on her own nonexpert impression of what a medical education should entail, coupled with the suggestions of her treating physician, Dr. Scott Meyers. While Dr. Meyers has opined that he did not believe it would be difficult for the School of Medicine to appoint a staff aide or surrogate to shadow McCulley, the court finds that this evidence fails to support the plaintiff's claim of reasonable accommodation. Dr. Meyers has not been shown to have any expertise in the formulation of medical curricula, and in fact explicitly acknowledged that he would defer to the judgment of the administrators of the School of Medicine. There is simply no competent evidence which controverts the evidence submitted by defendants showing that the Motor Technical Standards are an integral and essential part of medical education, and that altering them would be both dangerous and diminish the quality of the educational experience.

The accommodation sought by McCulley is similar to that sought by the plaintiff in *Southeastern Coll. v. Davis*. The plaintiff there, a hearing-impaired nursing student, requested accommodation in the use of faculty staff who could interact with patients on her behalf. The Court concluded that the accommodation would not be reasonable.

> [T]he only evidence in the record indicates that nothing less than close, individual attention by a nursing instructor would be sufficient to ensure patient safety if respondent took part in the clinical phase of the nursing program.... In light of respondent's inability to function in clinical courses without close supervision, Southeastern, with prudence, could allow her to take only academic classes. Whatever benefits respondent might realize from such a course of study, she would not receive even a rough equivalent of the training a nursing program normally gives. Such a fundamental alteration in the nature of the program is far more than the "modification" the regulation requires.

442 U.S. at 409-10 (citation omitted).

More recently, in *Cunningham v. University of New Mexico Board of Regents*, ___ F.3d ___, 2013 WL 4492168 (10th Cir. Aug. 23, 2013), the Tenth Circuit addressed an ADA and Rehabilitation claim brought by a medical student suffering from Irlen Syndrome, which is characterized by dyslexia and fragmented vision. The plaintiff student sought accommodation by modifications in the testing conducted by the medical school. The Tenth Circuit held that the plaintiff had failed to show that the accommodations were necessary, but further addressed the plaintiff's suggestion that the medical school should have changed its broader academic requirements:

> To the extent that Mr. Cunningham avers UNM should have changed its program requirements, such an accommodation would not be reasonable. A public entity is not required to make modifications where the entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. And, as we have previously explained, educational institutions are accorded deference with regard to the level of competency needed for an academic degree. Compelling an educational institution to change its requirements for advancement through its medical school program would represent a substantial, rather than a reasonable accommodation, because it would fundamentally alter the nature of the educational services and program it provides. It would therefore be unreasonable for Mr. Cunningham to demand that UNM change its requirements regarding the time it takes to graduate or pertaining to successful completion of the nationally recognized Step 1 test. The district court therefore correctly dismissed Mr. Cunningham's ADA and Rehabilitation Act claims against UNM.

2013 WL 4492168, at *8.

Here, the uncontroverted evidence shows that the use of a staff aide or surrogate to perform all necessary physical movements of patients would fundamentally change the School of Medicine's educational program. The expert evidence supplied by the administrative and academic staff of the School of Medicine in support of the Motor Technical Standards is essentially uncontroverted. Further, "[w]hen the accommodation involves an academic decision, 'courts should show great respect for the faculty's professional judgment.'" *Amir v. St. Louis University*, 184 F.3d at 1028 (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)). In light of the uncontroverted evidence,

the court grants summary judgment as to plaintiff's Rehabilitation Act and ADA claims.

Finally, the defendants also argue that the plaintiff is not entitled to recover compensatory damages under § 504 of the Rehabilitation Act, because there is no evidence of intentional discrimination. *See Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009). That is, there is no evidence of either an intent to discriminate or even deliberate indifference towards deprivation of the plaintiff's rights. *See Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999). The plaintiff argues that compensatory damages should be available because Dr. Stites, the ultimate decision maker, was not directly involved in the interactive process prior to his decision to deny admission.

The court finds that compensatory damages are not justified. There is no evidence that Dr. Stites reached his decision prior to or independent of the careful, thorough, and interactive exchange of information between McCulley and the School of Medicine's representatives. Rather, the uncontroverted evidence establishes that the School engaged in an interactive dialogue with the plaintiff, carefully reviewed all the information and solicited the opinions of the clinical rotations directors, and then submitted all this material to Dr. Stites for his review.

Dr. Stites's subsequent decision was consistent with the existing case law dealing with the obligation of educational institutions to accommodate disabled students. *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1078 (2006) (wheel-chair bound and sight impaired student failed to he was otherwise qualified to attend graduate school); *Falcone v. University of Minnesota*, 388 F.3d 656, 659-60 (8th Cir. 2004) (Rehabilitation Act did not require medical school "to tailor a program in which [plaintiff] could graduate with a medical degree without establishing the ability to care for patients"); *McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850, 858-59 (5th Cir. 1993) (Rehabilitation Act did not require law school to accommodate plaintiff by allowing part-time attendance and at-home examinations). Thus, even if the plaintiff had met her burden of showing that she was able

to complete the School of Medicine's program with reasonable accommodation, the court finds that the evidence fails to establish any basis for compensatory damages.

The court therefore grants the defendants' motion for summary judgment. As the Supreme Court observed in *Southeastern Comm.*, "[o]ne may admire [plaintiff's] desire and determination to overcome her handicap," while simultaneously determining that the relevant law does not force the School of Medicine to abandon "reasonable physical qualifications for admission to a clinical training program."442 U.S. at 414.

IT IS ACCORDINGLY ORDERED this 31st day of October, 2013, that the Defendant's Motion for Summary Judgment (Dkt. 41) is granted; the plaintiff's Motion to Strike (Dkt. 56) is denied.

s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE